[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 234 
The facts set out in the justice's return, though not very clearly stated, seem to be substantially as follows: The plaintiff and the defendant were in possession of adjoining farms; that of the plaintiff was a part of a farm formerly owned by Jacob Loop, and the defendant's farm formerly belonged to John C. Hogeboom. The two farms of Hogeboom and Loop were divided by a line running nearly east and west, that of Hogeboom being on the southerly, and that of Loop on the northerly side of this line, and being, it would appear, of equal width on the division line. A portion of the distance, at the westernmost end of the division line, the land on either side was unenclosed, and had never been fenced, but for the residue of the distance, it was enclosed and cultivated land. It was admitted that from time immemorial, the western portion of the fence, being about one-half thereof, was kept and maintained by John C. Hogeboom and his predecessors, in the title of his farm, and that the remainder, being the eastern part thereof, had, during the same time, been kept and maintained by Jacob Loop and his predecessors, in the title of the farm which he owned. The dividing point between the two parts of the line was marked upon a diagram annexed to the return.
John C. Hogeboom died in 1840, having, by his will, divided his farm between his two sons, Peter and Henry. The part falling to Peter, abutted upon the western end of the division line between the two original farms, the fence upon which had been immemorially maintained, as has been mentioned, by Loop and his predecessors, while the portion of Henry, the other devisee, abutted partly upon the same portion, but for the greater part upon the portion of the line, the fence upon which had been so maintained by J.C. Hogeboom, and those under whom he claimed. About 1844, the defendant purchased the part of the original farm of Hogeboom, which fell to Henry Hogeboom, and the part devised to Peter was purchased by *Page 235 
one Gilbert. The plaintiff became the owner of Loop's farm in 1848. No change was made respecting the division fence until 1849, when Gilbert caused the fence on that part of the line between him and the plaintiff to be divided by the fence viewers of Ghent. In March, 1854, the plaintiff made application to the fence viewers to divide the fence between him and the defendant upon that part of the original line where the defendant's farm adjoined a portion of the plaintiff's. The defendant chose a fence viewer, but protested against any new division of the line, except as to the portion that had not theretofore been fenced. The fence viewers, notwithstanding, divided the fences upon that part of the original line which ran between the plaintiff's and the defendant's respective possessions, marking the point of division on a diagram. The cattle escaped from the plaintiff's land into the defendant's, though the portion of the fence which belonged to the defendant to maintain, according to the decision of the fence viewers.
The three courts, which have passed upon the case, have determined that the fence viewers had jurisdiction to divide the fences notwithstanding the alleged prescription, and that the duties of the parties in respect to the burden of maintaining the division fences were legally fixed thereby.
I shall assume that there may be a valid prescription, by which the owner of land may become bound to maintain perpetually the whole of the division fence between himself and the adjoining proprietor. The cases referred to by the defendant's counsel, and some others which I have examined, seem very satisfactorily to establish this position. (13 Vin. Ab., 164, tit. Fences, E. 1; id., p. 166, E. 14; Binney v. The Proprietors, c., in Hull,
5 Pick., 503; Starr v. Rookesby, 1 Salk., 335.) Nor do I entertain any doubt but that when such a prescription is established, it fastens itself upon the land charged with the burden, and in favor of the tenements benefited by it. It is the usual case of a servitude in lands, the law concerning which has been adopted by the common law from the civil law; and every part of the premises charged with the burden, called the servienttenement, is as much bound as the whole of *Page 236 
the original premises were, and every part of the dominanttenement is entitled to claim the benefit of the charge against the premises bound. (Hills v. Miller, 3 Paige, 254; Child
v. Chappell, 5 Seld., 246.)
There is another question about which the counsel for these parties differ, upon which I am of opinion with the defendant. If such a prescription as that upon which the defendant insists were established, I do not think it could be affected by any decision which the fence viewers could make. The only disputes which these officers are empowered to settle are such as respect the proportion or particular part of the fence which is to be maintained or made by the respective owners of adjoining lands. (1 R.S., 353, § 33; Laws 1850, ch. 319.) The act in the first place provides that when two or more persons shall own lands adjoining each other, each of them shall make and maintain a just proportion of the division fence, unless the owner of one of them elect to let such land lie open. (Id., § 30.) It is only in administering this provision that the agency of the fence viewers can be invoked. If the case be such that one of the parties is bound by grant, covenant, prescription, or in any other way, to build the whole of the division fence, the statute does not apply, and the assessors have, I conceive, no jurisdiction of the case.
But I am of opinion that there was no prescription in the present case. The original proprietors of the Hogeboom farm are one side and of that of Loop on the other, were once bound each to maintain his just proportion of the division fence. The respective proportions belonging to each to maintain, might have been settled by agreement or by the intervention of fence viewers, if such an office existed at the early period when the farms were first settled. As there is no evidence of a determination of fence viewers, we may assume that the fence was divided by agreement. There is no evidence, nor any reason to believe that the division was in any respect unequal; or that during the course of years that ensued either of them did any thing more than that which it was his duty to do. Now a prescription supposes something originally *Page 237 
adverse to the rights and interests of the party who is to be concluded by acquiescence and lapse of time. If one of two proprietors will, for a period of time sufficient to establish a prescription, maintain a fence for the benefit in whole or in part of the adjoining proprietor, the law will presume a grant or covenant by which he became legally obliged to do so. It is the fact, that the party having the original right, has acquiesced in doing or suffering that which he could have prevented if he had chosen to do so, that the law lays hold of to found a presumption against him. These former proprietors were each bound to maintain his just proportion of the division fence, and they could have been compelled to do so. But they elected to do voluntarily what the law would have obliged each of them to do on the application of the other. There was no acquiescence by either in any encroachment upon the rights of the other, and consequently neither can be said to have slept upon or waived their rights, or to have acquiesced in any infringement of them. There is no ground for presuming a grant or covenant on the part of Hogeboom or his grantor, that the particular half of the line fence which they are shown to have maintained, should be perpetually kept up at the cost of the owner of that part of his farm, and so of the other part of the fence; for the existence of the division line, and the law respecting the duties of adjoining proprietors sufficiently explains all that has been done by them respectively. I am unable to see that lapse of time can have any just influence upon such a case as this. We are to presume that the original parties divided this fence in the manner which was done because the law required that each should maintain his just proportion of the fence, and they had no difficulty in defining the share of each. There is no reason which I can perceive why such a division should not be just as effectual immediately after it was made, as it would be in twenty or in fifty years thereafter. There is no doubt but that it would be binding upon them while their respective possessions continued to be coterminous and where there was no other change of circumstances to make the division unequal or unjust. *Page 238 
The principle, that to establish a title by prescription, there must be some infringement or usurpation of the right of the party to be concluded, and an acquiescence therein for the required period, will be found well stated in the opinion of the court inParker v. Foote (19 Wend., 309), where several other cases of the same tendency are referred to.
But I concede that a division of fences by agreement, with or without a subsequent lapse of time, is of the same force as a decision by fence viewers pursuant to the statute. The statute implies that these are only different methods of establishing a division, for it gives the fence viewers jurisdiction only where the parties are unable to agree upon the respective proportions of the fence to be maintained by each. But it would lead to very absurd consequences to hold that the action of these officers, proceeding as they must do in a summary way, would attach for all coming time upon the respective parcels of land which they charge or exonerate mutual servitudes or easements, whatever change of boundaries might take place. In the constant traffic in lands which is going on, and the changes which are every day taking place by which large farms are converted into small ones, and the contrary, by divisions and subdivisions and consolidations, these rights and obligations respecting fences would very soon cease to have any relation to present coterminous possessions; but a system of easements would grow up, not adapted to existing circumstances, but founded upon original and distant agreements and divisions by fence viewers, which would be extremely inconvenient in practice, and quite inconsistent with the spirit and intention of the statute. That provides for the case of "persons having lands adjoining," and charges each with the obligation of maintaining his just proportion of the fences. This proportion is of course changed whenever a change takes place in the extent which each owner has in the lands which he adjoins, and then a new adjustment of course becomes necessary. The statute refers to the state of things which shall exist when the viewers are called upon in a given case, and has no reference to any former ownership of adjacent possessions. *Page 239 
The precise point arose in Connecticut, and was decided by the Supreme Court of Errors in that State, in accordance with the foregoing views. (Wright v. Wright, 21 Conn., 329.) The case of Rust v. Low (6 Mass., 90), relied upon by the defendant's counsel, did not present the present question. There are, it is true, expressions in the opinion of Chief Justice PARSONS which look as though he considered an assignment by fence viewers equivalent to an obligation imposed by prescription; but he was not speaking of the permanency of one or the other of these titles, but only as to its effect for the time being. I think the question we are now considering was not presented to the mind of the learned judge.
My conclusion is, that the judgments under review were not erroneous.
All the judges concurring,
Judgment affirmed.